### MARLATT *vs.* WARWICK AND SMITH.*

1. When a purchase is made at a sheriff's sale, under a parol agreement with the defendant in execution, that he shall be permitted to redeem, he will be entitled to a reconveyance, on paying what may be due to the purchaser.

2. If a defendant in a suit dies after the complainant has been examined as a witness, and his administrators are made defendants in his place, this evidence will be admitted at the hearing. The complainant was competent at the time when it was taken, and that is the test of admissibility. It cannot be rejected because the defendant was prevented from testifying by his death.

3. Inadequacy of price at a judicial sale is not, of itself, sufficient cause to avoid the sale, unless so gross as to be proof of fraud, or to shock the judgment and conscience.

4. If the plaintiff, at a sheriff's sale, sees that the defendant is under the impression that the plaintiff is purchasing for his benefit, and permits him to remain and act under it, and by means of that impression, and the co-operation of the defendant produced by it, purchases the property at an inadequate price, the purchase will be held to have been made in trust for the defendant.

---

The bill in this case was filed against Warwick and R. M. Smith. Smith died after answer filed, and the evidence in part taken, and his heirs and administrators were made parties. The bill sets forth that Marlatt, in 1861, confessed a judgment to Warwick, Smith, and J. C. Norris, and shortly after, another to Smith alone; and that, in 1862, his real and personal property was sold under these judgments by the sheriff; that Warwick and Smith, at those sales, became the purchasers of nearly all of the real and personal estate sold; that the sales were made, and the property purchased by them, under an agreement that they would purchase and

---

* CITED *in Hogan* v. *Jaques,* 4 *C. E. Gr.* 127; *Walker* v. *Hill's Ex'rs,* 6 *C. E. Gr.* 201; *Kloepping* v. *Stellmacher, Id.* 329; *Dodd* v. *Wakeman,* 11 *C. E. Gr.* 485; *S. C.,* 12 *C. E. Gr.* 565; *Woodward* v. *Bullock, Id.* 513.

hold the property for his benefit, after paying out of it the debts due to them, and their expenses, and give him the right to redeem it by such payment. And that because of that understanding, they were permitted to buy, and did buy, the property at prices far below its value.

The bill prays an account of what they have realized from the sale and produce of the property, and that they may be declared to hold the residue, and the proceeds of it, after payment of their debts and expenses, in trust for the benefit of the complainant, and may pay over and reconvey to him.

The defendants, by their answer, deny that there was any such understanding or agreement; that the sales were fair, open, public sales, at about the usual prices, and that on the sale of the real estate, Marlatt was expressly notified by them, that any property they might buy at the sale they would buy for themselves, and not for him. A replication was filed, and proofs were taken, and the cause was heard upon bill, answer, and proofs.

*Mr. J. Wilson* and *Mr. P. D. Vroom*, for complainant.

*Mr. E. W. Scudder* and *Mr. Browning*, for defendants.

THE CHANCELLOR.

The main controversy in this cause is upon the questions of fact. There is but little dispute, and no real difficulty, on questions of law.

It was settled in this court, in the case of *Combs* v. *Little*, 3 *Green's C. R.* 310, that when a purchase was made at sheriff's sale under a parol agreement with the defendant that he should be permitted to redeem, he would be entitled to a reconveyance, on paying what was due to the purchaser. This decision is founded on the plainest principles of equity. And the decision already made in this cause upon the demurrer to the equity of this bill, has settled the question here, and will preclude the defendants from raising it again.

Another legal question is on the admissibility of the evi-

dence of the complainant, after the complainant had been examined.

R. M. Smith died intestate, and his administrators, widow, and heirs, were made parties. The act of 1859, (*Nix. Dig.**928, § 34,) which allows parties to be sworn, excepts cases where either of the parties sue or are sued in a representative capacity. Had the suit been brought against Smith's administrators, or had Marlatt been offered, after they were substituted, he would have clearly been incompetent. When he was sworn, he was competent.

The position of the defendants is, that the competency must exist at the hearing, when the evidence is offered to be read, or at least, that the other party must have had an opportunity to be sworn; and that if he dies before the testimony is closed, without being sworn, the testimony of the other party who had been sworn cannot be used; that the plain intention of the act is, not to allow the testimony of one party when that of the other cannot be had.

But the words of this act are plain and unambiguous, and cannot be narrowed by a supposed intention not expressed; the words are, "nor shall any party be sworn in any case when either of the parties sue or are sued in a representative capacity." The prohibition is to "being sworn;" it makes the time of swearing the test; if the witness is competent, then the exception does not apply. This is in accordance with the well settled rule of evidence, both at law and in equity, that the objection to the witness must exist at the time of his being sworn; if a witness should, after being examined, die, become interested in the suit, or be convicted of crime, his testimony would not be rejected on that account. The testimony of Marlatt is competent.

Another question raised is, whether great inadequacy of price is sufficient in equity to set aside the sale, or to authorize the court to deem the purchasers trustees for the surplus above the judgment debts. The uniform current of the authorities settles that mere inadequacy of price, where parties stand on an equal footing, and there are no confidential

* *Rev.*, p. 378, sec. 3.

relations between them, is not of itself sufficient to set aside a sale, unless the inadequacy is so gross as to be proof of fraud, or to shock the judgment and the conscience. *Bank of N. Brunswick* v. *Hassert, Saxt.* 1; *Simmon's Ex'r* v. *Vandegrift, Ibid.* 55; *Mercereau* v. *Prest,* 2 *Green's C. R.* 460; *Osgood* v. *Franklin,* 2 *Johns. C. R.* 23; *Howell* v. *Baker,* 4 *Johns. C. R.* 118; *How* v. *Weldon,* 2 *Ves., sen.,* 576; *Peacock* v. *Evans,* 16 *Ves.* 512.

But the judges in these cases are careful to say that *mere* inadequacy is not sufficient, and their language implies that when attended by circumstances which show that it would be inequitable to confirm the sale, it is a very important fact among other circumstances, to induce a court of equity to interfere; that when very great, it is, of itself, almost sufficient. Inadequacy of price then, can affect the sale only where it is great, very great, such as of itself to shock the judgment and the conscience. This question requires an examination of the evidence as to the value of the property and the prices brought.

The value of property is to some extent a matter of opinion and judgment; and even fair and intelligent witnesses will honestly differ very much in their estimates. In this case a number of such witnesses were sworn on both sides, and differ considerably about the value of the lands sold; yet from comparing their testimony, I think a result can be reached as to the value of most of the parcels, sufficiently satisfactory to base an opinion upon. As to the personal property, no evidence is offered of its actual value, but it is shown that it was sold under circumstances that induced the persons present at the sale to suppose it was being bid in for the benefit of Marlatt, and made them refrain from bidding, and that it sold below its value; perhaps at half its value; but this inadequacy on a sale of goods of such nature will not, standing by itself, be sufficient to declare the purchase fraudulent, or in trust for the debtor.

The lands sold consisted of ten tracts, sold in nine parcels,

the value and price of which were different, and each must be considered separately.

The first tract was sold by itself; it was called the Home farm, adjoined the village of Hightstown, and contained ninety-four acres. From the proof, I consider it worth ten thousand five hundred dollars. It was subject to mortgages for six thousand five hundred dollars, with an arrear of interest of about two hundred dollars, leaving its value, subject to the mortgage, three thousand six hundred dollars; it was sold to Smith for one hundred and twenty-five dollars, or about one-thirtieth of its real value.

The second tract, called the Cutler farm, of one hundred and five acres, and the third tract, called the Meyers farm, of fifty-four acres, were sold in one parcel. Both had large, thrifty peach orchards in their prime; their value was fairly twelve thousand seven hundred dollars, or eighty dollars per acre. Deducting the amount of mortgages, nine thousand five hundred dollars, and seven hundred dollars interest in arrear, the equity of redemption was worth twenty-five hundred dollars; it was sold to Smith for one hundred dollars, or one twenty-fifth of its value.

The fourth tract, called the Milford lot, was sold to a stranger for about its value.

The fifth tract, known as the Scott farm, of eighty-four acres, was worth three thousand five hundred dollars. Deducting a mortgage for two thousand dollars with two hundred and forty dollars arrear of interest, the equity of redemption was worth one thousand two hundred and sixty dollars; it was sold to Warwick for fifty dollars, or one twenty-fifth of its value.

The sixth tract, or the Duncan lot, was sold to Smith for ten dollars, subject to mortgages; he shortly after sold it in the same condition for two hundred and twenty dollars, or twenty-two times the price he paid.

The seventh tract was the Cranberry farm, of twenty-eight acres; the title had been in dispute, and was tainted, but it had on it a large peach orchard, bearing a crop that year,

which defect of title did not take away, and from the evidence, I judge that by time or settlement the disputed title was nearly at rest, and that the property would have brought, as it was, sixty dollars per acre, or one thousand six hundred and eighty dollars; it was sold to Warwick for six hundred dollars, a little more than one third of that value.

The eighth tract was called the store lot; it was worth two thousand five hundred dollars, subject to a life annuity of twenty-five dollars to a widow, in compensation of dower. If this was valued at five hundred dollars, the lot was worth two thousand dollars, and Marlatt owned half; it was worth one thousand dollars, and was sold to Smith for two hundred and seventy-six dollars, being a little more than a fourth of the value.

The ninth tract was one half of the Asher Moore lot, the whole worth two thousand dollars; and the half subject to the mortgage and interest was worth six hundred and fifty dollars; this was sold to Warwick for one hundred and thirty-five dollars, or one-fourth of that value.

The tenth tract was called the Dye farm, which contained one hundred and six acres; it was subject to a mortgage for four thousand dollars, on which two hundred and forty dollars interest was due; Marlatt owned half: that half was sold to Warwick for five hundred dollars. Its value was fixed by a sale shortly after, made by Warwick jointly with A. Perrine, who owned the other half; the price got was eight thousand six hundred and ninety-two dollars, or four thousand four hundred and fifty-two dollars above the encumbrances; of this, Warwick got for Marlatt's half two thousand two hundred and twenty-six dollars, being a sum more than four times greater than his bid at the sheriff's sale.

These tracts comprise the greater part of the sheriff's sales. It would be very troublesome, and it is not necessary for the purpose of this decision, to analyze the evidence as to the values of the peach orchards, and compare them with the prices.

The value fixed for the second parcel, composed of the

Myers and Cutler farms, being eighty dollars per acre, is made reliable by the fact, that the Myers farm has been since sold on a foreclosure of the mortgage, and brought four thousand dollars, or seventy-four dollars per acre, after a large crop of peaches had been gathered from it. One great element of its value was its large peach orchard in full bearing; these yield well but a few seasons, and after one full yield the value of the orchard was greatly diminished, and this will easily account for the difference in price. Besides, the foreclosure sale being for four thousand dollars in cash, was a more severe test of the value than a sale subject to a mortgage for three thousand dollars, which required only one thousand dollars in cash to complete.

The result is, that real property, fairly worth eleven thousand four hundred and ten dollars, was sold by the sheriff to Smith and Warwick for seventeen hundred and eighty-six dollars, less than one-sixth of the value.

The dwelling-house of Marlatt had been conveyed by him to his son James at the commencement of his pecuniary embarrassment, for the alleged consideration of two thousand dollars; this consideration was made up by fixing that value on services supposed to be rendered by the son to the father; he was twenty-six years old, and unmarried, and had always lived with and been supported by his father; this homestead was worth four thousand dollars, and was unencumbered. Smith required this to be sold; he bought it for one hundred dollars. If these sales are held valid, Marlatt was insolvent, or so seriously embarrassed at the time, that this conveyance to his son may be held fraudulent and void as against creditors, in which case Smith would hold the homestead, worth four thousand dollars, for one hundred dollars. This would make the whole result, that they purchased property worth fifteen thousand four hundred and ten dollars, for eighteen hundred and eighty-six dollars, or less than one-eighth of its whole value.

The inadequacy of the consideration is great and gross, but I am not willing to hold that it of itself proves fraud, or that the court ought to infer, in order to save Smith and Warwick

from the imputation of intending to perpetrate a great wrong, that they bought in trust for Marlatt, as Chancellor Kent did in *Howell* v. *Baker.*

I agree with the remarks of Sir Thomas Clarke, master of the rolls, in *How* v. *Weldon*, when he says: "The price for which the share was parted with, is about a fourth part. By the rule of the civil law, if half had been paid it would have been a mere nullity. *Our law differs from that,* but though the inadequateness of the value will not, of itself, be sufficient to set aside the contract, *yet it is a very material ingredient, and, with other things, will go a great way toward it.*" It is a fact in the case that would strongly support the proof, were it otherwise weak, that the purchases were made for the benefit of Marlatt.

The next question of fact is, whether these purchases were made by Smith and Warwick, under an express agreement by them with Marlatt, that they would buy in the property for his benefit, and hold the same in trust for him, after they had realized the amount of their debts, costs, and expenses.

The bill charges this to be the fact; the answer expressly denies it. It is one of the principal questions in the cause. Its consideration involves a review of a large amount of evidence. The burthen of proof is upon the complainant. If he relies upon the agreement he must positively show its existence, and as the defendants have denied it under oath, in an answer clearly responsive to the charges of the bill, he must prove it by more than one witness. Two witnesses, or one witness, with such circumstances as are equal to a second witness, are necessary before the court can allow itself to be convinced that the answer is not true. No more than this is required, because two defendants have sworn to the denial in the answer.

In moral influence, the denial of two defendants would have more effect than the denial of one, except in cases where, as in this, the promise charged may have been made by one. Smith and Warwick were combined in interest, and were acting together in this matter in such way that the promise

or agreement of one, made for both, in the absence and without the authority of the other, would bind both.

In July, 1861, Marlatt was indebted to Warwick, Smith, and James C. Norris, separately, for money borrowed, and they severally were security for him as accommodation endorsers on notes running to maturity and discounted in bank to large amounts. He was extensively engaged in the peach business, and had invested large sums of money in it. The failure of the peach crop for several years, and its then certain failure for that year, made it evident that he could not meet his notes at maturity. He had a large amount of property, and though it was largely encumbered, he estimated it as worth at least twenty thousand dollars more than his debts. Alarmed either by his situation, or the urgency of creditors, (it is really of little importance by which,) he offered to secure these three by mortgage. Warwick and Norris may have requested security before he offered it; Smith did not. They, upon consultation, thought it best that Marlatt should give a judgment bond, and confess judgment to them; Marlatt consulted Smith about the propriety of this; Smith had been his old neighbor and friend, had been engaged with him in jointly purchasing property, and he had been for many years surety on the bond of Smith, as state treasurer. Smith was a man of business capacity and intelligence, and his reputation for these and for integrity, was well known in the state. He had Marlatt's confidence, and stood in such relation to him, that Marlatt naturally would rely on him as his adviser, even in matters where Smith had an adverse interest.

Marlatt's object was to secure these creditors. He proposed to do it by a mortgage. They preferred a judgment, that they might cover all his personal and real property, and have the enforcement of it at their own disposal; it was for them the best security. By Smith's advice he gave it, and as Marlatt alleges and swears, upon their promise that they would not press him unnecessarily, or sacrifice his property; and that if a sale became necessary, they would buy in the property

for his benefit, after paying the amounts due to themselves out of it; these promises Smith and Warwick deny explicitly in their answer, and Warwick and Norris in their testimony. A bond, with warrant of attorney to confess judgment, and conditioned for the payment of six thousand nine hundred and seventy-one dollars and ninety cents, was given by Marlatt to Smith, Warwick, and Norris, and dated July 22d, 1861. A like bond and warrant was given by Marlatt to Smith, dated January 20th, 1862, conditioned for the payment of six hundred and twenty-four dollars, an amount inadvertently omitted in the first bond. There is no question about the consideration or fairness of these bonds; Marlatt really owed the amounts. On both, judgments were entered immediately after their respective dates, executions issued, and levies made on all his property.

Marlatt alleges and swears, that a few months after the date of the first judgment bond, Smith and Warwick represented to him that it would be better for him to have a sale under the execution; that such property as would bring a fair price could be let go, and the price credited on his debt; and that they would buy in such as might be struck off at a sacrifice and hold it as security for his debt, and allow him to redeem it; and that under this promise the sales by the sheriff were had; that he, Marlatt, consented to it by reason of his confidence in the friendship and judgment of Smith.

The defendants, Smith and Warwick, in their answer explicitly deny that they made these promises and representations; but it is a naked denial, without showing whether anything, or what, passed between them on this subject. And they further say that they distrusted him on account of his litigious spirit, and took the advice of counsel a day or two before the sale of the real estate, as to what course to pursue at such sales to avoid any implication with him, and were wary and cautious about making any promise or representation that might complicate them; and that, by advice of their counsel, they notified Marlatt before the sale and at the sale, both privately and in public, that what they might buy

they should buy for themselves; and that Smith, in telling him so on the day of sale, told him if he did not wish his property sold at that time he must have the sale adjourned, and that Marlatt permitted the sale to go on without any effort to adjourn.

Their denial of the representation and promises is responsive, and must be taken· as true, unless overcome. Marlatt himself is the only direct witness to prove them, unless the testimony of W. Hutchinson, who heard Warwick say, in 1863, that he now had his money, and he wanted to settle with Marlatt, and be out of the affair, is considered as direct evidence. But on this point there is a strong and accumulated weight of circumstantial evidence, that cannot be overlooked or disregarded. This bears strongly, too, upon another important point, the notice given to Marlatt, at and before the sale of the real estate, that they intended to buy for themselves. Marlatt says he was told by Warwick on that day, before the sale, that Smith wanted to see him to have some little evidence, for fear there might be trouble with his other creditors; and that, in consequence of this, he took the notice given to him by Smith and by Warwick, that they could buy for themselves only, when given to him in presence of witnesses, as done to save appearances with the public, and not to affect the understanding between him and them.

The sale of the personal property was conducted in such manner as convinced many of the neighbors attending, that it was intended to buy in the whole for Marlatt's benefit. Marlatt himself interfered with bidding, and the whole affair, as shown by the testimony, was so managed that the by-standers would naturally come to that conclusion; the result was that there was but little or no competition. All the property, with slight exceptions, was bought in by Warwick, for himself and Smith, or was transferred to them after the sale, and the amount realized was quite small, compared with the value of the articles sold; most, if not all, bought by Smith and Warwick, was left on the ground, in the possession and use of Marlatt, who continued there as before, using all, and

consuming and selling some of it. Marlatt acquiesced in, and aided the hasty manner of sale, and did not protest against it, or request his friends and neighbors who stood there evidently deterred from bidding by some cause, to aid him by bidding at the sale. They understood his interest and wishes to be the other way, and regarded them.

Smith and Warwick had occasion for their money, but they had no use or occasion for the household goods, or other personal property of Marlatt. The natural course of things would have been for them to have invited and encouraged competition and let strangers buy. And Marlatt's conduct cannot be explained on any hypothesis, except that he believed they were buying for his benefit.

This sale was on the twenty-seventh day of January, and on the 31st of March, two months later, the real estate was sold. In the meantime, Marlatt had been left in the use and possession of the personal property; the position and comfort of himself and family had not been disturbed, nor does he appear to have received any notice that this state of affairs was only temporary, and that he must soon give up everything to them. The first notice he received was on or about the day of the sale of the lands. As to this, the fact that Smith and Warwick went to counsel to get advice about their course is somewhat significant. If there was no agreement, why did they want advice. They may have wanted it, because they saw that Marlatt supposed they were buying for his protection. But if the recollection of their counsel is correct, they did not disclose to him that fact. His impression is that he originated the advice as to notice, on account of his knowledge of Marlatt's litigious habits.

Warwick clearly contradicts Marlatt's story, that he told Marlatt that Smith's notice was to be given for the purpose of protecting the sale against other creditors; and as the burthen of proving this is on Marlatt, he requires further evidence. He has no further direct evidence on this point, but there is much in the circumstances that proves that he must have so understood the notice, if Warwick did not tell him

so. Warwick recollects but one conversation on the subject; that in the hall of the tavern, in presence of Meesler and Perrine. The answer of Smith and Warwick states that they told Marlatt this, both in private and before witnesses; if true, they must, either together or severally, have had a private conversation with him before he was let into the hall to be warned before witnesses; his conduct there, as proved by the witnesses, shows that this notice did not produce the effect that it must have done had he not been notified of it, or supposed it a mere form; he made no reply, but walked off unexcited, saying or muttering something that was not understood.

The next scene is the sale in the bar-room. Here ten tracts of land, the bulk of Marlatt's property, the whole result of the active life of a man now sixty, was sold in an hour, or half an hour. So far witnesses differ.

The time itself is unprecedented in a sale in the country, of such a number of tracts, of so great value, when the sale was a real one. There were enough persons assembled to make a real competition; there were real purchasers for some of the valuable tracts. Some inquired as to encumbrances; there was no answer. Smith knew, but declined or omitted to tell, he intended to buy; Warwick knew, but did not answer; above all, Marlatt, who gave the mortgages, knew, and omitted to tell; his son James knew, and did not tell. The sale went on, and the bystanders, justly and of necessity judging that the property was to be bought in for Marlatt, did not bid. Marlatt had been told that what might be bought by Smith and Warwick would be for themselves only, and not for him; that if he wanted to protect himself he must have the sale adjourned. He saw bidders driven away, and his property sold for a song, including the house in which he lived. All that was needed to secure a fair sale, was to have told the encumbrances on each tract, or to have asked for the offered adjournment, to ascertain them satisfactorily. Yet he asked for no adjournment, was silent as to the encumbrances, discouraged purchasers, and beyond all, though of

a litigious, troublesome disposition, was not displeased with the men that were so ruthlessly ruining him and his family, but was whispering to and conversing with them, as if conspiring with them against the public, to aid in his own destruction.

It is impossible to believe that he would act as he did on that day, unless under the impression that the land was being bought for his ultimate protection. And the inference is just as certain that Smith and Warwick, when this sale was going on, saw and knew that their notice of the morning had not been understood, and that he still supposed that they were buying for his protection. These conclusions, from the evidence, appear to me to be irresistible. I can have no doubt.

The fact that Smith, who held in his hand a paper that purported to contain an account of the encumbrances, did not communicate the amount to the bidders, is established. Were it otherwise, and were it made to appear that he did inform them from that paper, the fact that the encumbrances on each of the two parcels first sold are overstated by three thousand dollars, might be sufficient to set aside the sale of those two tracts. Such a misrepresentation, made by the person who became the purchaser, whether innocently or fraudulently, should set aside the sale.

The conduct of the parties, after the sale, in the management of this property, gives strong support to the evidence of Marlatt.

He continued in possession of the homestead, and, to some extent, in the management of several of the farms. The produce was stored with him, and some of it used by him at pleasure. He and his wife and son were actively engaged in the business and work of gathering peaches, assorting them, and preparing them for market, and this without compensation. Marlatt says he had none; Warwick says he was allowed, like the other laborers, one dollar per day, a matter hardly credible, if it were entirely uncontradicted. I cannot believe that Marlatt, after he knew that all his property had

been placed by the sale in their hands, for a nominal price, and they been enriched by his ruin, would have voluntarily continued serving them with all his skill and energy, for no pay, or nominal wages.

I am not willing to believe that the answers of Smith and Warwick are untrue, when they deny that any promise or agreement was made with Marlatt to purchase the property for his benefit, and allow him to redeem it when his debt was paid.    I would rather believe that, supposing him to be litigious and troublesome, they may have carefully avoided making any direct promise, and yet have led him to expect that this would be done, by representing what was the usual course, or what might be done to protect him, if he would confess a judgment to them; they meaning to deal justly with him, but to keep the power in their own hands.    Few men in his situation confess judgment, without such representations or prospect.

I can believe the notice given at the day of sale to Marlatt, was substantially as they state it, yet, acting as they had done until that time, in concert, and with the supposition on his part that they had been purchasing for his benefit, it would be an effort for them to give him a notice couched in plain terms that they were his antagonists in that matter from that time; they would shrink from it.    They would more probably tell him that they had been advised by counsel to give that notice, to save trouble, and he must not think hardly of it.    If they shrink from saying that the trouble feared was trouble with him, he would not be alarmed.    This may be speculation, but in whatever way the matter occurred, the result is certain.    Marlatt saw his property sold under the mistake that they were purchasing for his benefit; and they, knowing his mistake, bought the property on unequal terms, reaping the advantage of his error.    From their subsequent conduct, I have no doubt that they intended to do him justice; and their only object was to keep the control in their own hands, so as to determine themselves what was that justice, without danger of litigation from him.    Warwick's

admission to Hutchinson, and Smith's answer to Marlatt's applications for settlement, show that intention. When Marlatt, by frequent and repeated urgency and reproaches, and above all, by an unwarrantable public attack upon Smith at a political meeting of mutual friends, peculiarly calculated to affect strongly a person in his situation, offended Smith, it was not to be wondered at, that he should refuse to speak to, or negotiate with him further, and resolved to let him see that he had him in his power. Then Smith refused to negotiate when Warwick was willing.

I am gratified to arrive at this conclusion, to which the evidence plainly leads, as it relieves the defendants from any imputation, either of untruthfulness in their answer, or of intending to take advantage of the false impressions of Marlatt to obtain his property at such grossly inadequate prices. It is difficult to say which, under the circumstances, would be the darkest stain.

A sheriff's sale made, and permitted by Marlatt to go on, under so serious a mistake, when it was in his power to prevent it, cannot be permitted to stand. To correct mistakes, and avoid transactions made under the influence of mistakes, is one of the plainest and most ancient heads of equity jurisdiction, and it has been frequently used in cases of sheriff's sales. *Seaman* v. *Riggins,* 1 *Green's C. R.* 214; *Howell* v. *Hester,* 3 *Green's C. R.* 266; *Campbell* v. *Gardner,* 3 *Stockt.* 423.

The purchase, in this case, of the complainant's property by Smith and Warwick, under the circumstances, must be decreed to be made in trust, to permit him to redeem it by paying the amount due to them and the expenses incurred by them. An account must be taken of what they have received from the sale or the rents of the property, and for the proceeds of the lands sold by them.

The defendants must be allowed all the proper expenses incurred about the management of the property, and a fair compensation for their pains and trouble in such management. Let the master allow for the trouble of management one half

of the net yearly proceeds of the lands managed and cultivated by them, after paying all expenses, taxes, and repairs; and during the time that Marlatt participated in the working and management of the property, let this be divided between Marlatt and the defendants; Marlatt to have one half. After Marlatt ceased to aid, let the whole be allowed to the defendants until the receiver took charge; the homestead of Marlatt, and its proceeds, not to be taken into account. If the net amount already received by the defendants, in money, is not sufficient to liquidate the debt to them, enough of the property must be sold to pay the deficiency; and if they have received more, they must pay the excess to Marlatt.*

* Decree affirmed, 4 *C. E. Gr.* 439.

